THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DANNY QUIVER, Defendant-Appellant.

First District (4th Division)   No. 1—88—1017

Opinion filed November 8, 1990.

Randolph N. Stone, Public Defender, of Chicago (Thomas J. Brosnan and Violet Ricks, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Jeanette Sublett, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

After a jury trial, defendant, Danny Quiver, was found guilty of home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(2)), residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3), and aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(a)). Defendant was sentenced to 12 years in the Illinois Department of Corrections.

Defendant appeals, seeking reversal of his home invasion and residential burglary convictions and remand of the cause for resentencing for the aggravated battery conviction; or reversal of all of his convictions and remand of the cause for a new trial; or remand of the cause for resentencing without the use of the victim impact statement.

Defendant raises the following issues for our review: (1) whether the State proved that he knowingly entered an occupied dwelling place; (2) whether numerous instances of alleged misconduct in the State's closing arguments deprived him of his right to a fair trial; and (3) whether the trial properly considered the victim impact statement as a factor in aggravation prior to imposing sentence.

We affirm.

At trial, the evidence established that on April 10, 1987, at approximately 1:30 a.m., defendant, without authority, entered complainant's residence. Complainant lives in a 100-year-old mansion with his brother.

Complainant testified that on the evening of April 9, 1987, he and his brother went out for dinner. They returned home at approximately 12:30 a.m., April 10. The brothers entered the house through a side door. Complainant went up to his bedroom, located on the second floor toward the front of the house. His brother's bedroom is on the third floor toward the rear of the house. Complainant fell asleep at approximately 1 a.m.

At approximately 1:30 a.m., complainant was awakened by a severe pain in the area of his head. When he got up from his bed, he noticed defendant standing on the other side of the room. Defendant then approached complainant and identified himself as a police officer. Complainant noticed that defendant carried a shiny object in his hand. Defendant then struck complainant with the object. It was later determined that the object defendant held was a pair of pliers.

After being struck, complainant fell to the floor. Defendant then proceeded to place his hands around complainant's neck and told him that he was going to kill him. Complainant, after struggling with defendant, was able to push defendant off him. Defendant ran out of the bedroom and complainant went up to the third floor to check on his brother's condition. Complainant's brother was asleep and had not been harmed. Complainant got his brother's .25 caliber automatic pistol. Both he and his brother then went downstairs to call the police. The telephone that complainant intended to use was located in the kitchen on the first floor. Complainant's brother did not have a telephone in his bedroom.

Upon entering the kitchen, complainant noticed that the pantry door was partially closed. This door is normally kept open. When complainant opened the door, defendant lunged at him with what appeared to be a knife. Defendant then threatened to kill complainant. At that time complainant shot defendant three times. The object in defendant's hand was a screwdriver.

When the police arrived, a rear window in the house was found open; a baseball cap was discovered on the ledge of the window; and a bicycle that did not belong to complainant was found beneath the open window.

As a result of his encounter with defendant, complainant sustained a broken nose, a broken cheekbone, and bruises and lacerations to his face. Complainant's left eye remained completely closed for three weeks.

Defendant's version of the events is vastly different from complainant's testimony. According to defendant, he left his mother's house on his 10-speed bicycle at about 11:20 p.m. on April 9, 1987. He testified that he was on his way to "hang out" with some friends on the near north side of Chicago. While in the vicinity of Clark Street and Diversey Avenue, he stopped for a rest. At that time, he noticed complainant staring at him. Complainant then allegedly approached defendant and invited him over to his house. Defendant believed that complainant wanted to have a sexual encounter.

Defendant testified that when they arrived at the house, complainant told him to leave his bicycle by the side of the house so as not to disturb his brother, who was also residing in the house. Complainant then allegedly took defendant to his bedroom and began to rub defendant's chest. When defendant asked for money, complainant supposedly became enraged and a fight between the two ensued.

At some point in his struggle with complainant, defendant stated that he was able to break away from complainant. He did, however, see complainant run upstairs to the third floor of the house. Defendant ran downstairs to the first floor and hid in the pantry. Subsequently, complainant found defendant in the pantry and shot him once in the chest. The police were then called. Defendant further testified that complainant stated, "[T]he son of a bitch will be dead by the time [the police] get here" and proceeded to shoot defendant two more times.

Assistant State's Attorney Lori Levin testified that she interviewed defendant while he was in the hospital. She was accompanied by two detectives from the Chicago police department. Defendant told her that his name was "Danny Davis" and that he parked his bicycle under a window outside of complainant's house. Defendant stated that he opened a window and entered complainant's house to see what was inside. He also admitted that his baseball cap fell from his head as he was climbing through the window. Defendant took a pair of pliers with him into the house. He also admitted to having struggled with complainant. Defendant never told the assistant State's Attorney that

the complainant picked him up to engage in some sort of homosexual act.

The State also introduced evidence of defendant's prior burglary conviction and four prior theft convictions. In rebuttal, complainant denied defendant's version of the incident.

After hearing all of the evidence, defendant was found guilty and sentenced to 12 years' imprisonment. It is from this decision that defendant appeals.

■ At the outset, we acknowledge that there are two vastly dissimilar versions of the events which transpired between complainant and defendant. The jury found defendant guilty and, therefore, evidently believed plaintiff's version of the incident. This court will not substitute its judgment for that of the trial court where evidence is conflicting. *People v. Woods* (1980), 81 Ill. 2d 537, 542.

Defendant first contends that his convictions for home invasion and residential burglary must be reversed because the State failed to prove that he knowingly entered a dwelling place of another. Defendant claims that he reasonably believed that complainant's home was a church or a museum in which there were no inhabitants.

■■ ■ Section 19—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 19—3) (hereinafter Code) defines "residential burglary" as knowingly and without authority entering into the dwelling place of another with the intent to commit a felony or theft therein. Section 12—11 of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—11) requires that the State prove defendant knew or had reason to know that one or more persons were present when he entered the premises. Knowledge is ordinarily proved by circumstantial evidence, rather than by direct proof. (*People v. Tackett* (1986), 150 Ill. App. 3d 406, 420.) "However, the State must present sufficient evidence from which an inference of knowledge can be made, as the inference must be based on established facts and not pyramided on an intervening inference." *People v. Austin* (1984), 123 Ill. App. 3d 788, 793.

■ In the instant case, we find there was sufficient circumstantial evidence that defendant knew or had reason to know the residence in question was an inhabited dwelling place. The house was located in a residential neighborhood. There were no signs or any indication that the structure was a museum or a church. We, however, note that at the front of the house there is a plaque indicating the mansion is of architectural and landmark significance. Whether a structure is a dwelling place of another depends upon the purpose for which it is used, not the nature of the structure. (*People v. Bales* (1985), 108 Ill. 2d 182, 190.) The structure was intended as a dwelling

as complainant had lived in the house for 10 years.

Defendant entered the house through a kitchen window at approximately 1:30 a.m., a time when its inhabitants would be at home. (People v. Austin (1984), 123 Ill. App. 3d 788, 794.) The kitchen is located on the first floor of the house. The dining room is also located on the first floor. These rooms are more indicative of what would be found in a residence rather than in a church or museum.

Complainant also testified that he had the television on when he fell asleep. It is conceivable that light and sound would emanate from the television. Lights were left on in the front of the house and over the side entrance door which would also indicate that the dwelling was inhabited. Defendant entered the house through a window. As the State argues, this surreptitious conduct would also indicate that defendant was concerned about being detected by someone inside of the house and took these measures to avoid capture.

■ We also note that at trial defendant denied having broken into complainant's house. On appeal, and according to a statement given by defendant to the assistant State's Attorney, defendant argues that he entered the house, believing it was a museum or a church. These conflicting defense theories, in effect, make his entire version of the events incredible. Under the circumstances of this case, we will not disturb the findings of guilt on both the residential burglary and the home invasion charges.

Next, defendant contends that numerous instances of prosecutorial misconduct in the State's closing arguments deprived him of his right to a fair trial. Defendant isolates each incident of alleged misconduct for our consideration and also asks this court to assess their cumulative effect.

■ Where numerous instances of misconduct are alleged, a reviewing court may consider their cumulative effect rather than assess the prejudicial effect of each isolated comment. (People v. Whitlow (1982), 89 Ill. 2d 322, 341.) Attorneys are allowed great latitude in closing arguments. (People v. Franklin (1976), 42 Ill. App. 3d 408, 421.) Reversible error, however, may be found where improper argument substantially prejudices the accused. People v. Cregar (1988), 172 Ill. App. 3d 807, 825-26.

■ Reviewing courts are reluctant to set aside a verdict based upon closing remarks unless such remarks are clearly prejudicial. (Franklin, 42 Ill. App. 3d at 423.) After carefully reviewing the State's closing argument, we no not find that the comments cited by defendant substantially prejudiced him so as to warrant reversal. We also note that the State's comments were based upon evidence pre-

sented at trial or reasonable inferences therefrom. See *People v. Bryant* (1983), 94 Ill. 2d 514.

Furthermore, as the State maintains, defense counsel's failure to object to these alleged instances of misconduct arguably waived review of this issue. *People v. Cregar* (1988), 172 Ill. App. 3d 807, 825.

■ Finally, defendant argues that his 12-year sentence was excessive because the trial court considered an improper aggravating factor when it admitted the victim impact statement. However, this argument is without merit as victim impact statements may be considered in noncapital offense cases such as this. See *People v. Felella* (1989), 131 Ill. 2d 525; *People v. Turner* (1989), 128 Ill. 2d 540.

■ Accordingly, the decision of the circuit court is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $75 as costs and fees for this appeal, pursuant to *People v. Agnew* (1985), 105 Ill. 2d 275, and *People v. Nicholls* (1978), 71 Ill. 2d 166.

Affirmed.

McMORROW, P.J., and LINN, J., concur.